# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **CARDINAL HEALTH, INC.** : <br> **7000 CARDINAL PLACE** : <br> **DUBLIN, OH 43017** : <br>   : <br>     Plaintiff, : <br>   : <br>   v. : <br>   : <br> **JEFFREY W. LOVESY** : <br> **6510 NORTH 14TH PLACE** : <br> **PHOENIX, AZ 85014** : <br>   : <br>     Defendant. : <br>   : <br>   : | Case No. 2:17-cv-512 <br><br> Judge _____ |

## COMPLAINT

Plaintiff Cardinal Health, Inc. ("Cardinal Health"), states as follows as its Complaint against Defendant Jeffrey W. Lovesy ("Lovesy"):

### PARTIES

1. Cardinal Health is incorporated in the State of Ohio and headquartered in Dublin, Ohio, located just outside of Columbus, Ohio. Cardinal Health is a global, integrated, healthcare services and products company, providing customized solutions for physician offices, clinical laboratories, medical clinics, hospital systems, pharmacies, ambulatory surgery centers, and manufacturers throughout the United States and worldwide. Cardinal Health also maintains robust distribution capabilities.

2. Cardinal Health's areas of expertise include providing hospitals, physician offices, medical clinics, pharmacies, third-party payers, and pharmaceutical and medical device

manufacturers with business solutions, patient solutions, treatment information, logistics, product manufacture and distribution services.

3. Cardinal Health provides its business solutions, products and services in part through a business unit known as Cardinal Health Specialty Solutions ("CHSS"). CHSS is comprised of several sub-units, including Cardinal Health Specialty Pharmaceutical Distribution or "SPD," which distributes specialty drugs to physician practices and hospitals, and VitalSource GPO and RainTree Oncology, both of which provide group purchasing and practice support services to oncology practices. Through CHSS, Cardinal Health assists community-based physicians' offices and clinics in optimizing clinical patient care and business functions. This includes helping implement innovative solutions to ensure that patients receive the latest and most effective medical treatments and drug therapies they need, including by providing technology and treatment information to the practices to help them select and manage the high-cost of specialty pharmaceuticals.

4. Lovesy became employed with Cardinal Health on November 19, 2012 as an Executive Sales Director. Lovesy provided Cardinal Health notice of his voluntarily resignation on December 19, 2016.  At the time of his resignation, Lovesy was Vice President, Direct Sales Management for CHSS and was responsible for a sales force comprised of over 70 individuals. In his written resignation notice, Lovesy indicated that his last day of employment with Cardinal Health would be January 18, 2017. See Exhibit 1.  Lovesy further indicated that he had accepted a position with Flatiron Health, Inc. (Flatiron) as Vice President of Sales, and stated he did not believe he would be competing against Cardinal Health. Id.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(a), as the amount at issue exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

6. Jurisdiction and venue are also proper in this Court pursuant to the controlling contracts entered into between the parties, which are attached as Exhibits 2 through 9. See Exhibit 2, p. 5 at ¶10; Exhibit 3, p. 5 at ¶8; Exhibit 4, p.5, at ¶8; Exhibit 5, p. 5 at ¶10; Exhibit 6, p. 5 at ¶10; Exhibit 7, p.5, at ¶8; Exhibit 8, p. 5 at ¶10; Exhibit 9 p. 5 at ¶10. The parties' expressly agreed this Court has personal jurisdiction over them. Id.

## FACTS

7. Upon joining Cardinal Health in 2012, and until his resignation effective January 18, 2017, Lovesy acted in various executive sales roles for Cardinal Health. His role specifically focused on managing CHSS' sales to community-based oncology practices and clinics. During his employment with Cardinal Health and until his resignation, Lovesy had authorized access to and was provided with CHSS' and Cardinal Health's confidential business information and trade secrets. This included confidential information and trade secrets pertaining to CHSS' and Cardinal Health's business with and future plans for oncology physician practices and clinics.

8. Prior to joining Cardinal Health, Lovesy had worked in oncology sales for various companies going back to 2006. One of those companies was RT Oncology Services Corporation, which is commonly referred to as "RainTree Oncology." At RainTree, Lovesy helped create RainTree's sales and marketing functions in the industry's market for oncology drugs and products. In particular, he played a key role in helping RainTree develop a niche for the sale of oral oncolytic products through RainTree's group purchasing organization or "GPO."

A GPO is an entity that acts as a purchasing agent for healthcare providers (the GPO's "members"). GPOs are able to take advantage of economies of scale and other efficiencies to obtain lower pricing from manufacturers and distributors for the benefit of the GPO members. GPOs also commonly provide services to their members in addition to purchasing, including consultative services, software, and other technology. As noted below, in March 2016, Cardinal Health acquired RainTree.

9. To further enhance CHSS' business solutions' offerings in the oncology market, in October 2014, Cardinal Health SPD became the exclusive specialty pharmaceutical distributor for members of RainTree Oncology. Additionally, Cardinal Health's VitalSource GPO became the preferred GPO for RainTree members for certain specialty pharmaceutical products not available to members through RainTree.

10. To again further enhance CHSS' business solutions' offerings in the oncology market, in March 2016, Cardinal Health acquired RainTree Oncology.  RainTree Oncology is currently one of the largest GPO's for community-based oncology practices and clinics in the United States, with particular emphasis on oral oncology products and related services.

11. Through Cardinal Health SPD, VitalSource GPO, and RainTree Oncology, CHSS currently offers a full array of pharmaceutical distribution, purchasing and related services to oncology practices and clinics.  Among those services are software solutions that combine clinical, operational and financial data to help the practices in many ways, including to monitor drug utilization, treatment methods, patient population, claims payment and denials, contract performance and reimbursement trends. These solutions further assist the clinics in managing the financial impact of cancer treatment for the patients, and help the practices improve the performance of their reimbursements and operations.  In addition, CHSS uses certain of the

practice and clinic data, in compliance with applicable laws and regulations, to provide health economics, patient outcomes, and market research services to pharmaceutical manufacturers and life science companies.

12. Flatiron is headquartered in New York City. Primarily, Flatiron is a healthcare technology company that seeks to improve cancer treatment for patients of oncology practices and clinics, and accelerate cancer research. Among other things, Flatiron provides software platforms and data analytics to oncology practices and clinics throughout the United States. Flatiron obtains clinical data on the active patients of oncology practices and clinics, and then aggregates, analyzes, uses, and, upon information and belief, sells the data to try to accelerate research and improve overall cancer care.

13. CHSS is engaged in selling and providing its business solutions services and products to the same oncology practices and clinics with which Flatiron does business. CHSS sells and distributes oncology drugs and products to oncology practices and clinics through its specialty pharmaceutical distribution business, Cardinal Health SPD, and contracts with physician practices and clinics through its GPOs, including Cardinal Health's VitalSource GPO and RainTree Oncology. Among other products and services, CHSS' GPOs also provide software to the practices and clinics, acquire clinical and economic data from the oncology practices and clinics, and use that data to provide analytical and consultative services to the practices and clinics and to provide health economics, outcomes research and other medical or scientific studies to pharmaceutical manufacturers. This includes data which reflects the types of oncology drugs and drug regimens that are the most effective when used by patients of the oncology practices and clinics. In short, CHSS competes directly with Flatiron for the same information from the same clients.

**FLATIRON'S BUSINESS COMPETITION AGAINST CARDINAL HEALTH**

14. While Cardinal Health may not provide or sell the same type of computer software programing services Flatiron sells, CHSS and Flatiron each solicit business from the same oncology physician practices and clinics and each seek to provide software to oncology physician practices that are designed to enable the practice to leverage its data to improve the care of patients and the operational and financial performance of the practice. Moreover, CHSS has learned from its oncology customers and prospects that Flatiron requires its oncology customers and prospects to enter into exclusive agreements with Flatiron concerning the practices' and the clinics' clinical data. This data includes, among other things, the types of drugs and drug regimens being used. This clinical data is needed for the CHSS software solutions to operate and for CHSS to offer its research support services to pharmaceutical manufacturers and life science companies. Thus, CHSS and Flatiron call on the same customers and prospective customers, provide software to those customers that require the same business and clinical information, and use that data to provide research services to pharmaceutical manufacturers and life science companies. But, Flatiron requires the customers to enter into exclusive agreements with Flatiron concerning the data. This results in direct competition between CHSS and Flatiron. Certain potential customers of CHSS have turned away CHSS by citing their exclusivity agreement with Flatiron.

15. Additionally, Cardinal Health has learned that Flatiron has entered into a collaborative business relationship or agreement with one of Cardinal Health's directly competitive GPOs and its affiliated specialty pharmaceutical distributor in the oncology market. Under this collaboration, the competitor GPO and specialty pharmaceutical distributor will offer

6

or arrange to provide Flatiron's services to oncology practices or clinics if those practices or clinics agree to switch their GPO and distribution services to the competitor GPO and distributor. This specialty pharmaceutical distributor and GPO directly compete with Cardinal Health SPD and with the CHSS' GPOs (VitalSource and RainTree) for the provision of pharmaceutical distribution and GPO services to oncology clinics and practices. Pursuant to this collaborative agreement or business arrangement with a direct competitor of CHSS, Flatiron is indirectly competing with CHSS.

16. Since February 2017, CHSS and Flatiron engaged in communications about a possible collaboration between CHSS and Flatiron that would mitigate the competitive advantage provided by Flatiron to the competitor GPO and distributor and enable CHSS and Flatiron to both retain access to the clinical data of practices that are using CHSS and Flatiron's services. But, on May 31, 2017, Flatiron informed Cardinal Health that Cardinal Health's direct competitor, with whom Flatiron had entered into a cooperation or collaboration agreement, had informed Flatiron that it did not condone Flatiron entering into any formal partnership or business arrangement with CHSS and, as such, Flatiron would not be doing so.

**CARDINAL HEALTH 'S PRE-SUIT EFFORT TO ENFORCE ITS AGREEMENTS WITH LOVESY**

17. Via a letter to Mr. Lovesy dated January 9, 2017, Cardinal Health informed Lovesy that it disagreed with his assessment that he would not be competing against Cardinal Health by becoming employed with Flatiron. See Exhibit 10. As a consequence, and because Lovesy had accepted employment with Flatiron already, Cardinal Health informed Lovesy that it was exercising its "clawback" rights under the various Restricted Share Unit Agreements (RSU Agreements) and Nonqualified Stock Option Agreements (Option Agreements) Lovesy had entered into with Cardinal Health. These Agreements include:

1. September 2, 2016 Restricted Share Units Agreement – Exhibit 2
2. September 2, 2016 Nonqualified Stock Option Agreement – Exhibit 3
3. September 10, 2015 Nonqualified Stock Option Agreement – Exhibit 4
4. September 10, 2015 Restricted Share Units Agreement – Exhibit 5
5. December 20, 2014 Restricted Share Units Agreement—Exhibit 6
6. August 29, 2014 Nonqualified Stock Option Agreement – Exhibit 7
7. August 29, 2014 Restricted Share Units Agreement – Exhibit 8
8. October 13, 2013 Restricted Share Units Agreement – Exhibit 9 [1]

18. With respect to the clawback payments, the RSU Agreements and Option Agreements provide that if Lovesy engages in "Competitor Conduct," Lovesy is required to pay back to Cardinal Health --within the now-expired thirty-day period Cardinal Health provided to him in its January 9, 2017 letter—a cash amount calculated, for example, as follows:

> "…an amount equal to (A) the gross gain to Awardee resulting from the payment of Restricted Share Units …that had vested at any time since the earlier of one year prior to the date the Competitor Conduct first occurred (as determined by the Administrator) or one year prior to the Termination of Employment, if applicable, less (B) $1.00. The gross gain is the Fair Market Value of the Shares represented by the Restricted Share Units on the date of receipt."

See Exhibit 2, at 4. (b)(ii).

All of the RSU Agreements Lovesy entered into contain the same language, and the Option Agreements contain substantially similar language. As reflected in Cardinal Health's January 9, 2017 letter, the total clawback amount Lovesy owes Cardinal Health under all eight agreements comes to $108,476.

19. Lovesy's employment with Flatiron meets the "Competitor Conduct" definition that is the same or virtually the same in each of the Agreements. Flatiron's business activities

---

[1] In 2012, Cardinal Health and Lovesy entered into an additional but different type of restrictive covenant agreement titled, "Non-Competition Agreement for Protection of Company Assets." This agreement contains traditional covenants, such as a one-year non-compete. But, it does not contain any "claw back" payment obligation. As an exception to the non-compete restriction in this agreement, Cardinal Health is not seeking to enforce the non-compete agreement against Lovesy at this time. Rather, Cardinal Health is allowing Lovesy to continue in his employment with Flatiron for now, provided Lovesy pays Cardinal Health his clawback obligations under his other RSU and Option Agreements listed above as well as Cardinal Health's reasonable attorneys' fees and costs incurred in this action, which the Agreements permit Cardinal Health to recover from Lovesy.

also clearly meet the definition of "Competitor." For instance, the September 2, 2016 RSU Agreement provides definitions of "Competitor Conduct" and "Competitor" which Flatiron's business activities clearly meet:

> 4. Special Forfeiture and Repayment Rules
>
> (b) Competitor Conduct
>
> As used in this Agreement, "Competitor Conduct" means accepting employment with, or directly or indirectly providing services to, a Competitor in the United States.  If Awardee has a Termination of Employment and Awardee's responsibilities to the Cardinal Group were limited to a specific territory or territories within or outside the United States during the 24 months prior to the Termination of Employment, then Competitor Conduct will be limited to that specific territory or territories.  A "Competitor" means any person or business that competes with the products or services provided by a member of the Cardinal Group for which Awardee had business responsibilities within 24 months prior to Termination of Employment or about which Awardee obtained confidential information (as defined by the applicable Cardinal Group policies or agreements).

See Exhibit 2 at p. 3 at ¶4. (b).

## COUNT I – BREACH OF CONTRACT

20. Cardinal Health reasserts each of its forgoing allegations as if fully rewritten herein.

21. On September 2, 2016, while employed by Cardinal Health, Lovesy entered into an RSU Agreement with Cardinal Health that awarded Lovesy 1,172 restricted share units. See Exhibit 2.

22. On September 2, 2016, while employed by Cardinal Health, Lovesy entered into an Option Agreement with Cardinal Health, pursuant to which Cardinal Health granted to Lovesy the option to purchase 1,944 common shares of Cardinal Health stock for a purchase price of $83.19.  See Exhibit 3.

23. On September 10, 2015, while employed by Cardinal Health, Lovesy entered into an Option Agreement with Cardinal Health, pursuant to which Cardinal Health granted to Lovesy the option to purchase 2,040 common shares of Cardinal Health stock for a purchase price of $84.27 per share. See Exhibit 4.

24. On September 10, 2015, while employed by Cardinal Health, Lovesy entered into an RSU Agreement with Cardinal Health that awarded Lovesy 1,273 restricted share units. See Exhibit 5.

25. On December 20, 2014, while employed by Cardinal Health, Lovesy entered into an RSU Agreement with Cardinal Health that awarded Lovesy 990 restricted share units. See Exhibit 6.

26. On August 29, 2014, while employed by Cardinal Health, Lovesy entered into an Option Agreement with Cardinal Health, pursuant to which Cardinal Health granted to Lovesy the option to purchase 2,078 common shares of Cardinal Health stock for a purchase price of $71.43 per share. See Exhibit 7.

27. On August 29, 2014, while employed by Cardinal Health, Lovesy entered into an RSU Agreement with Cardinal Health that awarded Lovesy 1,365 restricted share units. See Exhibit 8.

28. On October 16, 2013, while employed by Cardinal Health, Lovesy entered into an RSU Agreement with Cardinal Health that awarded Lovesy 563 restricted share units. See Exhibit 9.

29. Lovesy signed the RSU and Option Agreements in Exhibits 2 through 9 voluntarily and knowingly.

30. The restricted share units under Lovesy's RSU Agreements vested in accordance with the RSU Agreements' terms. Lovesy exercised his options pursuant to the Option Agreements in accordance with the Option Agreements' terms. Lovesy's economic gain under all eight of the Agreements totaled $108,476. Lovesy agreed that if he engaged in competitive business conduct during the one-year period following the termination of his employment with Cardinal Health, he became obligated to pay Cardinal Health--within 30 days following written notice from Cardinal Health—the cash equivalent of the total amount of his economic gain as defined in the RSU and Option Agreements. Lovesy has engaged in such competitive business conduct. Lovesy has received such written notice from Cardinal Health.

31. Lovesy agreed he received adequate consideration for the restrictions in the RSU and Option Agreements, including his receipt of the restricted share units, the stock options, employment with Cardinal Health, access to proprietary and confidential information, and more.

32. Lovesy further acknowledged and agreed that Cardinal Health was unwilling to award him the restricted share units or grant him the stock options without the forfeiture and repayment terms, which are reasonable, enforceable and ancillary to the Agreements.

33. None of the RSU and Option Agreements prohibits Lovesy from working for Flatiron or any other employer of his choice. Indeed, the Agreements expressly disclaim any attempt to impose a "non-compete" covenant on him.

34. Lovesy currently is employed with Flatiron in an executive sales position. Flatiron engages in business activities and sales efforts that compete directly and indirectly with CHSS's business solutions activities and sales efforts.

35. Lovesy has engaged in Competitor Conduct as defined in the RSU and Option Agreements.

36. Pursuant to the terms of RSU and Option Agreements, Lovesy is obligated to pay to Cardinal Health the cash equivalent to one year of his economic gain under the RSU and Option Agreements. That amount totals $108,476.

37. Cardinal Health sent a demand letter to Lovesy on January 9, 2017 requesting repayment to Cardinal Health of the $108,476. Lovesy has failed or refused to pay this money to Cardinal Health within the thirty-day time period set forth in the RSU and Option Agreements.

38. Each RSU and Option Agreement makes Lovesy responsible for paying Cardinal Health's costs and reasonable legal fees that it incurs with regard to its enforcement of the agreements and this proceeding.

**WHEREFORE**, Plaintiff Cardinal Health, Inc. respectfully requests the Court enter judgment in its favor against Defendant Jeffrey Wayne Lovesy, including in the amount of $108,476, plus Cardinal Health's attorneys' fees and costs incurred in obtaining such judgment, as well as for any other legal or equitable relief the Court deems proper.

Respectfully submitted,

*/s/ Kevin E. Griffith*
Kevin E. Griffith, *Trial Attorney*  (#0037297)
Chad J. Kaldor, *Of Counsel* (#0079957)
LITTLER MENDELSON, P.C.
21 East State Street, 16th Floor
Columbus, OH  43215
Telephone:    614.463.4201
Facsimile:     614.221.3301
E-mail:          kgriffith@littler.com
                    ckaldor@littler.com

*Attorneys for Plaintiff*

Firmwide:145046256.3 080589.1003